**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANGELA WALDNER, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>     v.<br><br>THE SCOTTS COMPANY, LLC and DOES 1–20,<br><br>               Defendants. | Case No. 7:25-cv-8424<br><br>**CLASS ACTION COMPLAINT for:**<br><br>1) Violation of the New York Consumer Protection from Deceptive Acts & Practices Act (N.Y. Gen. Bus. Law § 349); and<br><br>2) Violation of the New York False Advertising Act (N.Y. Gen. Bus. Law § 350).<br><br>**DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

1.    This consumer class action arises out of The Scotts Company, LLC's false advertising of its Miracle-Gro organic soil and fertilizer products (the Products). Scotts falsely represents that the Products are organic even though they contain synthetic, non-organic, and harmful forever chemicals known as perfluoroalkyl and polyfluoroalkyl substances (PFAS).

2.    Scotts uses the term organic to induce consumers into believing that the Products contain only naturally occurring, non-synthetic ingredients and are therefore a superior alternative to competing—and less expensive—products that are not labeled as organic. Reasonable consumers do not expect Scotts's organic Products to contain toxic forever chemicals like PFAS, especially when marketed for use in residential gardens to grow fruits and vegetables. Scotts fails to disclose that PFAS are present in its Products because it knows that this likely would influence their purchasing decisions to Scotts's financial detriment.

3.    Plaintiff Angela Waldner and Class members would not have purchased, or would have paid less money for, Scotts's organic Products had they known that the Products contain PFAS. Scotts's misleading, deceptive, and false advertising, and its unlawful, unfair, and fraudulent business practices, caused Waldner and Class members to purchase, purchase more of, or pay more for the Products than they would have but for Scotts's misrepresentations.

## II.    PARTIES

4.    Waldner is a consumer who relied on Scotts's false advertisements to purchase the Products, and she brings this action on behalf of herself and all those similarly situated.

5.    Waldner resides in River Vale, New Jersey. On or about March 9, 2025, Waldner purchased Scotts's Miracle-Gro Organic Potting Mix, Miracle-Gro and Organic Garden Soil, and Miracle-Gro Performance Organics All Purpose Container Mix from the Lowe's Home Centers

store located at 206 Route 303, Orangeburg, NY 10962. Waldner reviewed the labels on the
Miracle-Gro Organic Potting Mix, Miracle-Gro and Organic Garden Soil, and Miracle-Gro
Performance Organics All Purpose Container Mix bags and relied on the representations that the
Products were organic when she decided to purchase them. Waldner would not have purchased
the Products, would not have purchased as many Products, and would not have paid the price
premium that organic products command had she known that they contained synthetic, inorganic
PFAS.

6.      Waldner continues to desire to purchase organic soil and believes she would
purchase organic soil if they were truly organic and did not contain PFAS. She would purchase
one of Scotts's Products again if she could have confidence regarding the truth of its
advertisements. But because of Scotts's ongoing false, deceptive, and misleading advertising,
Waldner will be unable to rely on the advertising and packaging when deciding in the future
whether to purchase Scotts's organic soil Products. She will be harmed if, in the future, she is left
to guess whether Scotts's Products contain ingredients like PFAs and whether the Products are
worth the prices charged.

7.      Class members will also continue to purchase the Products, reasonably, but
incorrectly, believing that they are organic, based on the unlawful conduct alleged herein.

8.      Defendant The Scotts Company, LLC is a limited liability company organized
and existing under the laws of the State of Ohio, with its headquarters and principal place of
business at 14111 Scottslawn Road, Marysville, Ohio 43040. Scotts directly, and through its
agents, has substantial contacts with, and receives substantial benefits and income from and
through, New York.

9.     Waldner is unaware of the true names or capacities of the Defendants sued herein under the fictitious names Does 1 through 20 but prays for leave to amend and serve such fictitiously named Defendants once their names and capacities become known.

10.     Waldner alleges on information and belief that the named and Doe Defendants were: (1) acting as express agents, implied agents, ostensible agents, servants, partners, and/or employees of each other; (2) acting within the scope of and under such agency and employment, and with the full knowledge, consent, permission, approval, and ratification, either express or implied, of each of the other Defendants and benefited from the actions of every other Defendant, thereby adopting such conduct and actions as their own; (3) acting as each other's alter egos; and (4) aiding and abetting and offering substantial assistance to each other in the commission of the alleged wrongful acts.

11.     Waldner is informed and believes, and based thereon alleges, that each Defendant is in some manner intentionally, negligently, or otherwise responsible for the acts, omissions, occurrences, and transactions alleged herein.

### III.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5 million, there are more than 100 proposed Class members, and minimal diversity is met. Waldner is a New Jersey citizen, and Scotts is a citizen of Ohio.

13.     This Court has personal jurisdiction over Scotts because it regularly conducts business in the State of New York. Scotts has marketed, promoted, and sold its Products in New York throughout the Class Period (i.e., the statute of limitations preceding the filing of this action).

14.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Scotts transacts substantial business in this district and a substantial part of the events or omissions giving rise to Waldner's claims arose in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.    PFAS Are Not Organic

15.    Merriam-Webster's Dictionary defines organic as "of, relating to, or derived from living organisms."[1] The common understanding of the phrase "organic fertilizer" refers to ingredients that are derived or harvested from once-living plants or animals.[2]

16.    PFAS are highly resistant synthetic chemicals used in widespread industrial and consumer products since the 1940s.[3] In 2024, the U.S. Environmental Protection Agency declared the two most studied and produced types of PFAS—perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS)—as dangerous substances.[4]

17.    PFAS persist and bioaccumulate in the food chain when released into the environment and build up in the body when humans consume PFAS-contaminated food or water or are otherwise exposed to PFAS.[5] Exposure to PFAS, even at low parts-per-trillion (ppt), can

---

[1] *Organic*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/organic (last visited Oct. 7, 2025).

[2] Sally Reill, *A Guide to Understanding Fertilizers*, OSU Extension Service (pub. Jan. 2019, reviewed 2024), https://extension.oregonstate.edu/gardening/techniques/guide-understanding-fertilizers.

[3] *PFAS Explained*, U.S. EPA 1 (2024), https://www.epa.gov/system/files/documents/2023-10/final-virtual-pfas-explainer-508.pdf.

[4] Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.A. § 9602(a); 40 C.F.R. § 302.4, App. A; Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed. Reg. 39,124-01, 39,125 (May 8, 2024).

[5] Sibel Barisci & Rominder Suri, *Occurrence and Removal of Poly/Perfluoroalkyl Substances (PFAS) in Municipal and Industrial Wastewater Treatment Plants*, 84(12) Water Science &

build up in the human body over time and cause severe adverse health effects.[6] Because of the

cumulative effect, even a de minimus amount of PFAS exposure can negatively impact health.[7]

      18.    The United States Department of Agriculture's National Organic Program

develops and enforces national standards for organic crops, livestock, and agricultural products

sold in the United States.[8] Agricultural products are any commodity or product derived from

livestock marketed for either human or livestock consumption.[9] The USDA standards do not

apply to non-food products, including soils and fertilizers, and the USDA does not regulate the

use of "organic" for non-food products.[10] Nevertheless, non-food products like soil and

fertilizers can meet non-government, privately maintained standards that rely on the USDA

regulations, like those created by the Organic Material Review Institute (OMRI).[11]

---

Tech. 3442, 3443 (2021), https://pdfs.semanticscholar.org/3b10/37f0c12ad3757c8ffd0922cff95 ab36ecb46.pdf.

[6] *See* Rabia Amen, et al., *A Critical Review on PFAS Removal from Water: Removal Mechanism and Future Challenges*, 15 Sustainability 16173, at 1–3 (2023), https://www.mdpi.com/2071-1050/15/23/16173/pdf; *see also* U.S. National Institute of Environmental Health Sciences, *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)* (Mar. 6, 2025), https://www.niehs.nih.gov/health/topics/agents/pfc; Cleveland Clinic, *What Are Forever Chemicals (PFAS)? 5 Ways Forever Chemicals (PFAS) May Affect Your Health* (June 6, 2024), https://health.clevelandclinic.org/what-are-forever-chemicals-pfas.

[7] *PFAS Explained*, *supra* note 4, at 1; *see also* Molly M. Ginty & Courtney Lindwall, *"Forever Chemicals" Called PFAS Show Up in Your Food, Clothes and Home*, Nat'l Res. Def. Council (updated Sep. 18, 2025), https://www.nrdc.org/stories/forever-chemicals-called-pfas-show-your-food-clothes-and-home.

[8] USDA Agriculture Marketing Service, *National Organic Program*, https://www.ams.usda.gov/about-ams/programs-offices/national-organic-program (last visited Oct. 7, 2025); *see also* USDA Agriculture Marketing Service, *USDA Certified Organic: Understanding the Basics*, https://www.ams.usda.gov/services/organic-certification/organic-basics (last visited Oct. 7, 2025).

[9] Organic Foods Production Act of 1990, 7 U.S.C. § 6502.

[10] OMRI, *What We Do*, https://www.omri.org/what-we-do (last visited Oct. 7, 2025).

[11] *Id.*

19.     Under USDA regulations, "organic matter" means the "remains, residues, or waste products of any organism."[12] And the USDA defines "organic fraud" as the "deceptive representation, sale, or labeling of nonorganic agricultural products or ingredients as 100 percent organic, organic, or made with organic [ingredients]."[13]

20.     The USDA maintains a National List of Allowed and Prohibited Substances for organic production.[14] In general, the National List allows nonsynthetic materials and prohibits the use of synthetic materials.[15] The National List does not identify any "allowed" PFAS.

21.     Put simply, PFAS do not fall within any definition of organic, and no reasonable customer purchasing organic soil or fertilizer would expect their organic product to contain PFAS.

**B.     Scotts's Products Contain Inorganic PFAS**

22.     The Products at issue in this case consist of all Scotts Miracle-Gro soil and fertilizer products with packaging that represents they are organic. The Products include but are not limited to: Miracle-Gro Organic Raised Bed & Garden Soil, Miracle-Gro Organic Outdoor Potting Mix, Miracle-Gro Organic Indoor Potting Mix, Miracle-Gro Organic Garden Soil, Miracle-Gro Organic Potting Mix, Miracle-Gro Organic Raised Bed Soil, Miracle-Gro Performance Organics All Purpose Container Mix, Miracle-Gro Performance Organics In-Ground Soil, Miracle-Gro Performance Organics Raised Bed Mix, Miracle-Gro Organic Choice Potting Mix, Miracle-Gro Organic Choice Raised Bed & In Ground Soil with Compost, and Miracle-Gro Organic Choice Garden Soil.

---

[12] 7 C.F.R. § 205.2.

[13] *Id.* (citation modified).

[14] 7 C.F.R. §§ 205.600–205.602.

[15] 7 C.F.R. §§ 205.601, 206.602; *see also* USDA Agriculture Marketing Service, *The National List of Allowed and Prohibited Substances*, https://www.ams.usda.gov/rules-regulations/organic/national-list (last visited Oct. 7, 2025).

23.     During her investigation, Waldner conducted laboratory tests of various Products with the assistance of qualified expert technicians and consultants. The consultants and internal investigators purchased various Products from over a dozen different locations in Northern and Southern California, New York, New Jersey, and Oregon in 2024 and 2025 (the Sample Products). They transported the Sample Products to lab technicians while following proper chain-of-custody procedures, and the technicians securely tested the Sample Products for PFAS. Waldner's team also secured, sampled, transported, and tested Waldner's own Products (the Plaintiff's Products).

24.     Waldner's experts used EPA Method 1633A to test all Sample Products. The EPA and Department of Defense developed EPA Method 1633A to analyze PFAS in various environmental samples, including soil.[16] The experts compared their results with the EPA's Soil Screening Guidance, designed to help environmental and science professionals evaluate contaminated soil.[17] Generally, if contaminate concentrations fall below identified soil screening levels (SSLs), CERCLA does not require any further action or study.[18]

25.     The laboratory tested for PFAS in Scotts's Products by comparing their results to the EPA Regional Screening Levels (RSLs), EPA Risk-based SSLs, and EPA Maximum Contaminant Level (MCL)-based SSLs for each type of PFAS.

26.     Testing revealed that each of Scotts's organic Products contained numerous PFAS, many of which exceeded the EPA's RSLs and SSLs. In other words, under the EPA's

---

[16] U.S. EPA, *Method 1633, Revision A: Analysis of Per- and Polyfluoroalkyl Substances (PFAS) in Aqueous, Solid, Biosolids, and Tissue Samples by LC-MS/MS* at 1 (Dec. 2024), https://www.epa.gov/system/files/documents/2024-12/method-1633a-december-5-2024-508-compliant.pdf.

[17] U.S. EPA Office of Emergency & Remedial Response, *USEPA Soil Screening Level Guidance* at 1 (July 1996), https://semspub.epa.gov/work/HQ/175238.pdf.

[18] *Id.*

guidance, the levels of PFAS found in Scotts's Products could trigger further action or study under CERCLA. And none of the Products are organic, despite Scotts's advertised claims.

### *Miracle-Gro Organic Raised Bed & Garden Soil*

27.    Testing of the Miracle-Gro Organic Raised Bed & Garden Soil Sample Products revealed the presence of multiple PFAs, including PFOA and PFOS, and the PFOA and PFOS results exceeded applicable RSLs and SSLs.

28.    These analytical results indicate that the Miracle-Gro Organic Raised Bed & Garden Soil Product is not organic because it contains PFAS—two of which have been designated by the EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

### *Miracle-Gro Organic Outdoor Potting Mix*

29.    Tests revealed the Miracle-Gro Organic Outdoor Potting Mix Soil Sample Products revealed the presence of multiple PFAs, including PFOA and PFOS, and the PFOA and PFOS results exceeded applicable RSLs and SSLs.

30.    These analytical results indicate that the Miracle-Gro Organic Outdoor Potting Mix Product is not organic because it contains PFAS—two of which have been designated by the EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

### *Miracle-Gro Organic Indoor Potting Mix*

31.    Tests revealed that Miracle-Gro Organic Indoor Potting Mix contains multiple PFAs, including PFOA and PFOS. When present, the PFOA and PFOS results exceeded applicable RSLs and SSLs.

32.    These analytical results indicate that the Miracle-Gro Organic Outdoor Potting Mix Product is not organic because it contains PFAS—two of which have been designated by the

EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

### *Miracle-Gro Organic Potting Mix*

33.     Testing of Waldner's Miracle-Gro Organic Potting Mix revealed the presence of multiple PFAS, including PFOA and PFOS, and the PFOA and PFOS results both exceeded applicable RSLs and SSLs.

34.     These analytical results indicate that the Miracle-Gro Organic Potting Mix Product is not organic because it contains PFAS—two of which have been designated by the EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

### *Miracle-Gro Organic Garden Soil*

35.     Testing of Waldner's Miracle-Gro Organic Garden Soil revealed the presence of positive for multiple PFAS, including PFOA and PFOS, and the PFOA and PFOS results both exceeded applicable RSLs and SSLs.

36.     These analytical results indicate that the Miracle-Gro Organic Garden Soil Product is not organic because it contains PFAS—two of which have been designated by the EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

### *Miracle-Gro Performance Organics All Purpose Container Mix*

37.     Tests revealed that Miracle-Gro Performance Organics All Purpose Container Mix contains multiple PFAs, including PFOA and PFOS, and the PFOA and PFOS results exceeded applicable RSLs and SSLs.

38.    Testing of Waldner's Miracle-Gro Performance Organics All Purpose Container Mix revealed similar results to the Sample Products. It tested positive for multiple PFAS, including PFOA and PFOS, and the PFOA and PFOS results both exceeded applicable RSLs and SSLs.

39.    These analytical results indicate that the Miracle-Gro Performance Organics All Purpose Container Mix Product is not organic because it contains PFAS—two of which have been designated by the EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

### *Miracle-Gro Performance Organics In-Ground Soil*

40.    Tests revealed that Miracle-Gro Performance Organics In-Ground Soil contains multiple PFAs, including PFOA and PFOS, and the PFOA and PFOS results exceeded applicable RSLs and SSLs.

41.    These analytical results indicate that the Miracle-Gro Performance Organics In-Ground Soil Product is not organic because it contains PFAS—two of which have been designated by the EPA as hazardous substances under CERCLA—which are not related to or derived from living organisms.

### C.    Scotts's False and Deceptive Advertising

42.    On the packaging, Scotts advertises to consumers that the Products are organic soil and/or fertilizers, safe to use on edible plants and residential gardening. These representations for each Product are false.

43.    For example, the packaging of Miracle-Gro Performance Organics All Purpose Container Mix appears as follows:




44.     On the front of the packaging, Scotts markets Miracle-Gro Performance Organics

All Purpose Container Mix as an organic, premium potting soil with natural fertilizer and implies

that it is safe for use on fruit and vegetable plants by including images of tomatoes. Scotts also

includes a prominent a logo from the OMRI, indicating that the Products are "OMRI Listed for

Organic Use."

45.     On the back, Scotts markets the Miracle-Gro Performance Organics All Purpose

Container Mix as a product that "delivers the Miracle-Gro results you expect with the ingredients

you want." It promises "TWICE the bounty – more vegetables, flowers, and herbs – with organic

and natura ingredients."

46.     Images of packaging from each of the Products are attached to this Complaint as

Exhibit A.

47.     As discussed above, OMRI is a third-party, nonprofit organization that purports to

verify the substances used in organic production, including soil and fertilizers. Companies like

Scotts obtain OMRI verification through a self-reporting application process from the companies

seeking to use its label.[19] OMRI charges initial and annual company and product fees for the use of its "OMRI Listed" label.[20] The Company Fees vary according to the Company's Annual Gross Sales, with Initial Review Fees ranging from $610 to $7,500 and Annual Renewal Fees from $395 to $4,700.[21] Multi-ingredient products like Scotts's have an initial review fee of $1,010 and an annual review fee of $655.[22] OMRI charges annual product fees for each company product, including products that are repackaged and marketed under a different name without any modification.[23]

48.    OMRI uses the definitions from the USDA National List of Allowed and Prohibited Substances when verifying whether a company's self-reported ingredients comply with its standards.[24] If one of those ingredients is synthetic—like PFAS—it would have to be allowed on the National List for the product to receive OMRI's stamp of approval.[25] But even though PFAS are not allowed on the National List, Waldner is informed and believes that OMRI does not test for PFAS as part of their process. Scotts's use of the OMRI "Listed for Organic Use" adds to the deception and false advertisement of the Products as organic.

49.    Scotts's marketing, advertisements, and representations that its Products are organic and non-synthetic are false, misleading, and deceptive. Scotts sells soil and fertilizer

---

[19] OMRI, *What to Expect*, https://www.omri.org/suppliers/review-requirements (last visited Oct. 7, 2025.)

[20] OMRI, *Review Cost*, https://www.omri.org/review-cost (last visited Oct. 7, 2025).

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] OMRI, *What We Do*, *supra* note 11.

[25] USDA Agriculture Marketing Service, National Organic Program, *Guidance Classification of Materials* (NOP 5033), https://www.ams.usda.gov/sites/default/files/media/NOP-5033.pdf (last visited Oct. 7, 2025).

products made with ingredients that it knows, or should have known, contain PFAS. And Scotts

fails to disclose and/or conceals the presence of PFAS in its Products, fails to warn consumers of

their harms, and falsely advertise its Products as organic despite the presence of PFAS.

## V.    CLASS ALLEGATIONS

50.    Waldner brings this action on behalf of herself and all others similarly situated

under Federal Rule of Civil Procedure 23 and seeks certification of the following Class:

> All persons who purchased any of the Products in the State of New York for their
> personal use within the applicable statute of limitations period.

51.    The proposed Class excludes Scotts's current or former officers, directors, and

employees; counsel for the parties; and the judicial officer to whom this lawsuit is assigned.

52.    There is a well-defined community of interest in the litigation, and the Class is

easily ascertainable:

a.    Numerosity: The members of the proposed Class are so numerous that

joinder of all members is impracticable. Waldner is informed and believes that the

proposed Class contains hundreds of thousands of individuals who have been damaged by

Scotts's conduct. Waldner does not know the precise number of proposed Class members.

b.    Typicality: Waldner's claims are typical of the Class claims because all

Class members have been deceived (or were likely be deceived) by Scotts's false and

misleading implied advertising claims about the true chemical composition and

ingredients contained in its Products. Waldner advances the same claims and legal

theories on behalf of herself and all Class members.

c.    Adequacy: Waldner will fairly and adequately protect the interests of the

Class. She has retained counsel experienced in complex consumer class action litigation

and intends to prosecute this action vigorously. Waldner does not have antagonistic or adverse interests to those of the Class.

        d.    <u>Superiority</u>: The nature of this action and the nature of the laws available to Waldner and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to themselves and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members are miniscule compared to the burden and expense that would be entailed by individual litigation of their claims against Scotts. It would thus be virtually impossible for Waldner and the Class to obtain effective redress for the wrongs done to them on an individual basis.

        e.    <u>Public Policy Considerations</u>: Absent the class action, the Class and the public would not likely recover, or would not likely have the chance to recover, damages and/or restitution, or receive injunctive relief, and Scotts will, and will continue to, retain the proceeds of its fraudulent and deceptive misdeeds. A class action serves the important public policy considerations underlying the statutes and the legislature's intent in enacting them.

53.    This action involves common questions of law and fact that predominate over any questions affecting individual proposed Class members, including:

        a.    whether Scotts misrepresented material facts and/or failed to disclose material facts in connection with the packaging and advertising of the Products;

        b.    whether Scotts's use of false or deceptive packaging and advertising constituted false or deceptive advertising;

        c.    whether Scotts engaged in unfair, unlawful, and/or fraudulent business practices;

        d.    whether Scotts's conduct, as alleged herein, was intentional and knowing;

e.      whether Waldner and the Class are entitled to damages and/or restitution and in what amount;

f.      whether Scotts is likely to continue false, misleading, or unlawful conduct such that an injunction is necessary; and

g.      whether Waldner and the Class are entitled to an award of reasonable attorney's fees, interest, and costs of suit.

54.      Scotts engaged in a common course of conduct giving rise to the violations of the legal rights that Waldner and the Class seek to uniformly enforce. The claims involve similar or identical statutory violations, business practices, and injuries. The injuries sustained by Waldner and the Class flow, in each instance, from a common nucleus of operative fact—namely, Scotts's deceptive packaging and advertising of the Products as organic. Each instance of harm suffered by Waldner and the Class is a direct result of a single course of illegal conduct. Scotts exposed each Class member to the same or substantially similar deceptive practices, as the packaging of each Product bears the same representation (that the Product is organic). Individual questions, if any, are eclipsed by the numerous common questions presented in this action.

55.      Scotts has also acted, or failed to act, on grounds generally applicable to Waldner and the Class, supporting the imposition of uniform relief to ensure compatible standards of conduct towards the members of the Class.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Violation of the New York Consumer Protection from Deceptive Acts & Practices Act
N.Y. Gen. Bus. Law § 349

56.      Waldner repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

57.     Waldner has standing to pursue this claim because she has suffered injury-in-fact and has lost money or property because of Scotts's unlawful, unfair, and fraudulent actions, as alleged above.[26]

58.     The New York Consumer Protection from Deceptive Acts and Practices Act (NYDAP) prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce" in the State of New York.[27]

59.     Scotts's acts and practices as described herein were consumer-oriented because they undermined the ability of consumers, including Waldner and the Class, to evaluate their market options and to make free and intelligent choices.

60.     Scotts knowingly and/or willfully committed deceptive acts and practices in violation of the NYDAPA by engaging in a false advertising campaign that misled consumers into believing that by purchasing Scotts's organic soil and/or fertilizer Products, they were receiving a product that only contained organic ingredients, when, in reality, the Products contain synthetic, non-organic PFAS.

61.     Scotts made its false and misleading advertisements to increase the sales of the Products. Scotts knew, or should have known, that consumers, including Waldner and the Class, would believe that a soil or fertilizer labeled organic would be free from synthetic, non-organic chemicals like PFAS.

62.     Waldner and the Class acted as reasonable consumers in relying upon the deceptive acts and practices alleged above when purchasing the Products. Scotts's conduct is thus likely to mislead reasonable consumers acting reasonably under the circumstances. If

---

[26] *See infra* ¶¶ 5–6.

[27] N.Y. Gen. Bus. Law § 349(a).

Waldner and the Class had known that the Products were not organic and contained synthetic, non-organic forever chemicals like PFAS, they would not have purchased the Products, they would not have purchased as many Products, and they would not have paid the price premium that organic products command. Indeed, no consumer would purchase an organic product unless they believed the product was organic.

63.    Scotts's deceptive acts and practices are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Waldner and the Class.

64.    Scotts's violations caused injury to Waldner and the Class. Waldner and the Class have paid, and/or will continue to pay, money for the Products that they otherwise would not have paid but for Scotts's deceptive acts and practices in violation of the NYDAPA. Scotts is liable to Waldner and the Class because those money paid for the Products directly result from Scotts's unlawful conduct.

65.    In addition, Scotts's conduct continues to deceive the public. Scotts's false and misleading advertisements are likely to deceive current and prospective consumers making corresponding public injunctive relief necessary.[28]

66.    Therefore, Waldner and the Class seek damages, remedies, fees, and costs available under the NYDAPA, including, but not limited to, injunctive relief, recovery of actual damages and/or $50 per violation in statutory damages, whichever is greater, as well as treble damages, reasonable attorney's fees, and all other remedies this Court deems proper.[29]

---

[28] N.Y. Gen. Bus. Law § 349(h).

[29] *Id.*

## SECOND CAUSE OF ACTION
Violation of the New York False Advertising Act
N.Y. Gen. Bus. Law § 350

67.    Waldner repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

68.    Waldner has standing to pursue this claim because she has suffered injury-in-fact and has lost money or property because of Scotts's unlawful, unfair, and fraudulent actions, as alleged above.

69.    The New York False Advertising Act (NYFAA) makes "[f]alse advertising in the conduct of any business, trade or commerce" unlawful.[30] False advertising "means advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account not only representations, "but also the extent to which the advertising fails to reveal facts material in light of such representations with respect to the commodity . . . ."[31]

70.    Scotts's acts and practices as described herein were consumer-oriented because they undermined the ability of consumers, including Waldner and the Class, to evaluate their market options and to make free and intelligent choices.

71.    Scotts violated the NYFAA by publicly disseminating false, misleading, and unsubstantiated advertisements regarding the Products. Specifically, Scotts engaged in a false advertising campaign that misled consumers into believing that by purchasing Scotts's organic soil and/or fertilizer Products, they were receiving a product that only contained organic ingredients, when, in reality, the Products contain synthetic, non-organic PFAS.

---

[30] N.Y. Gen. Bus. Law § 350.

[31] N.Y. Gen. Bus. Law § 350-a(1).

72.     Scotts intentionally and knowingly misled consumers by making untrue and misleading statements about the benefits of its Products with intent to mislead Waldner and the Class.

73.     Scotts's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Waldner and the Class, about its Products. Waldner and the Class acted reasonably in relying upon the deceptive acts and practices alleged above when purchasing the Products. Scotts's conduct is thus likely to mislead reasonable consumers acting reasonably under the circumstances.

74.     Scotts's violation of the NYFAA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Waldner, the Class, and the public, who will be deceived into purchasing Products. These false statements led to financial damage for consumers like Waldner and the Class.

75.     As a direct and proximate result of Scotts's misleading and false advertisements, as well as Scotts's deceptive and unfair acts and practices, Waldner and the Class suffered ascertainable loss and actual damages.

76.     Waldner and the Class thus seek all damages, remedies, fees, and costs available under the NYFAA, including, but not limited to, injunctive relief, recovery of actual damages and/or $500 per violation, whichever is greater, as well as treble damages, reasonable attorney's fees, and all other remedies this Court deems proper.[32]

### VII.    <u>PRAYER FOR RELIEF</u>

For these reasons, Waldner prays for judgment against Scotts as follows:

---

[32] N.Y. Gen. Bus. Law §§ 350-d(a), 350-e(3).

a.    certifying the Class, appointing Waldner as Class Representative, and appointing her counsel as Class Counsel;

b.    ordering restitution and disgorgement of all profits and unjust enrichment that Scotts obtained from Waldner and the Class as a result of its unlawful, unfair, and fraudulent business practices;

c.    awarding Waldner and the Class all applicable actual, statutory, and punitive damages;

d.    awarding declaratory and injunctive relief as permitted by law or equity, including enjoining Scotts from continuing the unlawful practices as set forth herein, and directing Scotts to identify, with Court supervision, victims of its conduct and pay them all money it is required to pay;

e.    ordering Scotts to engage in a corrective advertising campaign;

f.    ordering Scotts to pay attorney's fees and litigation costs;

g.    ordering Scotts to pay both pre- and post-judgment interest on any amounts awarded; and

h.    ordering such other and further relief as may be just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Waldner demands a trial by jury of all claims so triable.

Dated: October 10, 2025

By:  *Jenn French*
Todd D. Carpenter, Cal. State Bar No. 234464
todd@lcllp.com
Jennifer M. French, Cal. State Bar No. 265422
jennf@lcllp.com
**LYNCH CARPENTER, LLP**
9171 Towne Centre Drive, Suite 180
San Diego, California 92122
Telephone: 619-762-1903

*Attorneys for Plaintiff and the Proposed Class*